# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

JULIE FERRAZZANO-MAZZA,  :
   Plaintiff,  :
         :
    v.  :  C.A. No. 14-239ML
         :
CAROLYN W. COLVIN, ACTING  :
COMMISSIONER OF SOCIAL SECURITY,  :
   Defendant.  :

## REPORT AND RECOMMENDATION

Patricia A. Sullivan, United States Magistrate Judge

  Plaintiff Julie Ferrazzano-Mazza is an active young woman who completed her Ph.D., lived alone on her farm (which she managed), cared for her dogs, worked in her herb garden, practiced yoga, socialized with family and friends, attended a women's group, enjoyed reading and writing, exercised to lose weight and (as she told health providers, but now denies) worked at her family's restaurant, yet alleges that she did these activities while fully disabled by pain caused by fibromyalgia and disc degeneration, as well as by mental health issues. Her claim is complicated by a "profound alcohol problem."

  Before the Court is her motion for reversal of the decision of the Commissioner of Social Security (the "Commissioner"), denying Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under §§ 205(g) and 1631(c)(3) of the Social Security Act, 42 U.S.C. §§ 405(g), 1383(c)(3) (the "Act"). Plaintiff contends that the Administrative Law Judge ("ALJ") committed reversible error by failing to find that fibromyalgia and other physical conditions are severe impairments at Step Two and by failing to giving sufficient weight to the opinions of her psychiatric nurse. Defendant Carolyn W. Colvin ("Defendant") has filed a motion for an order affirming the Commissioner's decision. The matter has been referred to me

for preliminary review, findings and recommended disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Having reviewed the record, I find that the ALJ's findings are well supported by substantial evidence. Accordingly, I recommend that Plaintiff's Motion to Reverse the Decision of the Commissioner (ECF No. 10) be DENIED and Defendant's Motion for Order Affirming the Decision of the Commissioner (ECF No. 14) be GRANTED.

## I.    **Background Facts**

Plaintiff claims that she became disabled on June 9, 2009, when she was thirty-three years old, as a result of the limiting effects of the pain caused by fibromyalgia and degenerative disc disease, coupled with anxiety, depression, bipolar disorder and panic disorder. She contends that active substance abuse serious enough to require two periods of in-patient treatment for detoxification – one of her treating providers labelled it as "a profound alcohol problem" – is not a material contributing factor. Tr. 503.

Beginning prior to and continuing into the period of claimed disability, Plaintiff earned her Ph.D. in finance and organizational behavior, although she did not complete her dissertation. Tr. 53-54. At the beginning of the period of disability, she was married; by the time of the hearing on November 14, 2012, she had divorced, Tr. 56, and had been living alone without help in a house on a farm that she owns and manages (for example, arranging for logging that generated income "to pay bills").[1] Tr. 53, 57, 63, 75; ECF No. 2-1 at 1. From 2003 through the

---

[1] This record information caused the Court to be concerned about Plaintiff's ongoing eligibility for *in forma pauperis* ("IFP") status in this case. Additional investigation revealed that, by the time of a March 2015 bankruptcy filing, Plaintiff reported income in late 2014 of over $1,000 per month earned from working part-time at her family's restaurant and between $4,000 and $5,000 net per month from her farm. In re Ferrazzano-Mazza, Case No. 1:15-bk-10207 (Bankr. D.R.I.), ECF No. 22 at 12. Similarly, her April 2014 bankruptcy filing indicates that she had been self-employed at her farm, in "agriculture," for the four years preceding the filing. In re Ferrazzano-Mazza, Case No. 1:14-bk-10080 (Bankr. D.R.I.), ECF No. 20 at 1. While they have no bearing on the merits of the case, these public records call into question Plaintiff's ongoing IFP eligibility. 28 U.S.C. § 1915(e)(2); see Daker v. Owens, Civil Action No. 5:12-cv-459 (CAR), 2014 WL 1159629, at *8 (M.D. Ga. Mar. 21, 2014) (when change in plaintiff's financial circumstances makes him no longer eligible for IFP status, IFP order vacated and plaintiff ordered to remit filing fee or case to be dismissed). In light of my recommendation that the ALJ's decision should

first half of 2009, Plaintiff's annual reported income consistently exceeded $20,000 per year

(except for 2006, when it was $19,025), Tr. 215-16, which she earned while working at

Murphy's, her family's restaurant.[2]  At the hearing, she claimed that she stopped working after

she tossed plates at a customer who was being very rude; she did not mention pain as a cause.

Tr. 61.  Although she stopped reporting income after 2009, the medical record reflects that she

continued to work at the restaurant throughout the period of alleged disability.  Tr. 354 (Dr.

Sadovnikoff's note of March 23, 2010, "[w]orked 81 hrs in 4 days.  Murphy's."); Tr. 305 (Dr.

Mann's note of April 22, 2010, "works with mother in restaurant"); Tr. 333 (Nurse Rosa's note

of May 26, 2010, "[w]orks fulltime @ family restaurant business"); Tr. 331 (Nurse Rosa's note

of June 23, 2010, "hardly working at family restaurant recently"); Tr. 502 (Phoenix House note

of April 2011, "She has worked full time for most of the past three years . . . reports . . . making

$3000 in past month.");[3] Tr. 430 (Nurse Benson's note of September 13, 2011, "Job Murphy's");

Tr. 432 (Nurse Benson's note of May 18, 2012, "Job: Murphy's").  When asked about this

evidence at the hearing, she admitted to going regularly to the restaurant, but claimed that she did

not work while she was there.  Tr. 61-62.

    Despite her claim of disability, Plaintiff has continued to pursue a wide array of personal

interests and activities, including yoga and meditation, walking regularly, writing, reading,

caring for her dogs, hobbies and sports, exercising (such as working out on the elliptical to lose

weight), socializing with friends and family, attending a woman's group, performing various

---

be affirmed, I have not ordered Plaintiff to show cause why she should not be ordered to pay the filing fee.  If the litigation of this case continues, Plaintiff's ongoing IFP eligibility should be reexamined.  See Keys v. Donahoe, No. 14 C 1297, 2014 WL 7332826, at *2-3 (N.D. Ill. Dec. 19, 2014) (inconsistency between bankruptcy schedules and IFP application can lead to dismissal of case, with or without prejudice).

[2] This business is also referred to in the record as "ROM Deli."  Tr. 59.

[3] At the hearing, when questioned about this record, she testified that she earned $3,000 in one month from logging she arranged at the farm, not from working at the restaurant.  Tr. 63.

household chores and going regularly to her chiropractor and to church. Tr. 77, 82-83, 250-51, 311, 519. While she claims that her panic attacks are so disabling that she cannot drive, Tr. 331 ("too anxiety ridden to drive"), the record also reflects three arrests for drunk driving ("DUI") over the same period. Tr. 73-74. These support the inference drawn by the ALJ that she was driving and that her decision to stop driving is likely attributable to the legal consequences of these convictions, including the repeated loss of her license. Tr. 34. The third DUI plainly affected driving as it caused her to be incarcerated for ten days after arrest and to be placed on home confinement for a year, with probation beyond that. Tr. 73-74, 410.

### A. Medical History

Plaintiff contends that her relevant medical history began almost a year before the alleged onset of disability (June 2009), when Dr. George Cohen of Massachusetts General Hospital saw her on August 28, 2008, for musculoskeletal pain that had persisted since late 2006. Tr. 492. Plaintiff reported fatigue, exhaustion, poor sleep and problems with memory and concentration, "although she works hard." Id. On examination, while he saw neither swelling nor limits on her range of motion, Dr. Cohen found tenderness in various specified points. Id. He diagnosed "[f]ibromyalgia/myofascial pain syndrome," prescribed a muscle relaxant and suggested treatment with a "tricyclic, or possibly with an agent such as Lyrica." Tr. 493. Whatever pain Plaintiff was experiencing prior to and for the ten months following her appointment with Dr. Cohen was not disabling because she worked continuously and attended school full time throughout. Plaintiff never returned to Dr. Cohen, although she emailed him a few times about medication side effects in the fall of 2008; he suggested she see a psychiatrist. Tr. 537-40. After 2008, she continued treatment for fibromyalgia based on his diagnosis with medication prescribed by various providers at Atmed Primary Care ("Atmed").

Also during the pre-onset period, while she continued to work, Plaintiff saw three neurologists for back and rib pain; apart from an MRI that revealed a small disc protrusion, no significant abnormality was found and treatment was limited to injections and physical therapy, to which she responded well. Tr. 287-303. This pain was also treated by chiropractor Dr. Nancy Puth, whom Plaintiff saw somewhat regularly both pre- and post-onset, although there are few legible treating notes in the record reflecting this course of treatment. Tr. 380-85, 412-19, 508-10. Finally, in February 2009, Plaintiff began therapy at the Quality Behavioral Health Clinic ("QBH"); at her initial evaluation, she reported anxiety, depression, panic attacks, chronic pain, but also a "very busy life/schedule," with increased alcohol use. Tr. 386.

The first post-onset mental health treatment record, from November 2009, reflects a visit with psychiatrist Dr. Henry Mann for anxiety; Plaintiff told him that she had tried going without medication in favor of holistic treatment, but ended up drinking alcohol. Tr. 304. In April 2010, she complained to Dr. Mann of panic attacks. He continued her medication for anxiety, prescribed a muscle relaxant and added Adderall because attention deficit hyperactivity disorder ("ADHD") had been diagnosed when she was a child, although he also told her "the ADHD diagnosis is incorrect." Tr. 82, 305. The first physical health treating record after onset is Plaintiff's February 2010, visit to her primary care physician, Dr. Gregory Sadovnikoff at Atmed, for a cold. Tr. 356. In March, Plaintiff returned to Dr. Sadovnikoff for her annual physical; all findings were normal with no complaint of pain. Tr. 354.

Plaintiff's most significant treatment in 2010 was in mid-May, when she referred herself to Kent Hospital for anxiety and alcohol detoxification and was hospitalized for three days. Tr. 306. Staff noted she "started drinking about two years ago – binge pattern – drinking to point of blackout – last episode of drinking was this a.m." Tr. 306. A hospital-based psychiatrist

diagnosed alcohol dependence and panic disorder; the mental status observations recorded at intake included "concentration: unremarkable." Tr. 307-11. At intake, her GAF[4] was assessed as 30; at discharge, she was less anxious and her GAF was assessed at 55, with a GAF score of 65 as highest in the past year. Tr. 322-23. One of the strengths listed in her treatment plan included: "[a]ble to return to work." Tr. 316. As the ALJ noted, this is the only hospitalization during the period of alleged disability. Tr. 36.

Also in 2010, on May 26, Plaintiff started treating at QBH with Nurse Cristiana Rosa, PCNS; during intake, Nurse Rosa diagnosed anxiety disorder, alcohol dependence and assessed a GAF score of 60.[5] Tr. 333-35, 544. In June 2010, Plaintiff denied recent alcohol use and said she was doing yoga, talked about anxiety caused by issues with her mother and husband and reported that she was "hardly working at family restaurant recently too anxiety ridden to drive." Tr. 331. Later that month, Plaintiff told Nurse Rosa that she was less anxious, was "still doing yoga, caring for the dogs, tending to the grounds," that she had attended her Ph.D. commencement in Minnesota and that her medications were helpful with no side effects. Tr. 329-30. At the end of 2010, she self-referred for a single appointment with Dr. J. Scott Toder, a

---

[4] The Global Assessment of Functioning ("GAF") scores relevant to this case are in the 61-70 range, which indicates "some mild symptoms . . . OR some difficulty in social, occupational, or school functioning . . ., but generally functioning pretty well, has some meaningful interpersonal relationships," the 51-60 range, which indicates "moderate difficulty in social, occupational, or school functioning," the 41-50 range, which indicates "serious impairment in social, occupational, or school functioning," the 31-40 range, which indicates "major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood," and the 21-30 range, which indicates "[b]ehavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment . . . OR inability to function in almost all areas." See Diagnostic and Statistical Manual of Mental Disorders, Text Revision 32-34 (4th ed. 2000) ("DSM-IV-TR"). While use of GAF scores was commonplace at the time of Plaintiff's treatment, "[i]t bears noting that a recent [2013] update of the DSM eliminated the GAF scale because of 'its conceptual lack of clarity . . . and questionable psychometrics in routine practice.'" Santiago v. Comm'r of Soc. Sec., No. 1:13-CV-01216, 2014 WL 903115, at *5 n.6 (N.D. Ohio Mar. 7, 2014) (citing Diagnostic and Statistical Manual of Mental Disorders at 16 (5th ed. 2013) ("DSM-V")). In response, the Social Security Administration ("SSA") released an Administrative Message (AM-13066, July 22, 2013) ("SSA Admin Message") to guide "State and Federal adjudicators . . . on how to consider . . . GAF ratings when assessing disability claims involving mental disorders." It makes clear that adjudicators may continue to receive and consider GAF scores. See SSA Admin Message at 2-6, available at http://www.nysba.org/WorkArea/DownloadAsset.aspx?id=51489 (starting at p.19 of PDF document) (last visited July 23, 2015).

[5] See n.4, *supra*.

rheumatologist; based on a "+" next to a list of potential tender points, it appears he found some. Tr. 327. Although the record is nearly illegible, Plaintiff claims that his diagnosis is "FM," or fibromyalgia. Id. It is impossible to tell what treatment was recommended.

In February and March 2011, Plaintiff began to see Nurse Happy Benson at Atmed, who started her on Savella for fibromyalgia; Plaintiff reported feeling "much better." Tr. 348, 350. During March 2011, Plaintiff saw Nurse Rosa for the first time since July 2010 and told her that she was going on a "spiritual retreat" for one month in Connecticut. Tr. 404.[6] Plaintiff reported a recent DUI, but said that the breathalyzer does not distinguish between ethanol and methanol. Tr. 405. She also reported to Nurse Rosa that she was exercising and about to start dieting. Id. Finally, in March, Plaintiff's chiropractor (Dr. Puth) sent her for a radiograph and MRI of the cervical spine – mild abnormalities were noted. Tr. 338-40.

As in 2010, Plaintiff's most significant medical treatment in 2011 related to alcohol abuse. In early April, she referred herself to the Phoenix House residential detoxification center for alcohol abuse treatment; Phoenix House notes state, "[s]he has a profound alcohol problem." Tr. 501, 503. At the initial interview, staff recorded that, "She has worked full time for most of the past three years . . . reports . . . making $3000 in the past month." Tr. 502. "Overall, [Plaintiff] reports no problems related to obtaining or maintaining employment and is not troubled or bothered by employment related difficulties. Consequently, help obtaining treatment for employment related difficulties is not important to [Plaintiff]." Id. The record records her employment status at discharge: "Employed - Full time (35+ hrs/wk)." Tr. 507.

In late April 2011, Plaintiff returned to Nurse Benson for medication follow-up, reporting "degeneration in her neck," but otherwise "feel[ing] pretty good." Tr. 346. Nurse Benson

---

[6] This would appear to be false; based on the records, Plaintiff was about to check herself in to Phoenix House for alcohol detoxification. See Tr. 501.

referred her for physical therapy.  Id.  Plaintiff did not appear at the July appointment with Nurse

Rosa because she was in jail following her third DUI arrest.  Tr. 407.  At the September 2011

appointment, Plaintiff reported to Nurse Rosa that she had been jailed for ten days and that she

was serving a sentence of home confinement.  Tr. 411.  By November 2011, Plaintiff told Nurse

Rosa that she was "dieting and exercising," and "works surveying her land for NRC."[7]  Tr. 513.

At the end of 2011, Plaintiff had one appointment with a provider named Susan Culbert,[8] to

whom Plaintiff apparently was referred by Nurse Rosa for possible ADD; Ms. Culbert noted "I

am not clear if [ADHD] is an accurate dx given her high academic achievement."  Tr. 515.

There is no record of any follow-up.

In 2012, Plaintiff continued to see Nurse Rosa, who noted, "[w]orking on losing wgt &

relieving stress by walking regularly, doing yoga . . . .  Home confinement likely to end late

Aug-early Sept."  Tr. 517-19, 523.  In June 2012, Nurse Rosa recorded, "mood stable, very

talkative as usual, happy about being in counseling."  Tr. 524.  In the spring, she had two

appointments at Gershon Psychological Associates, LLC, seeing first psychologist Dr. Jonathan

Gerson and then psychologist Dr. Christina Fucci.  Tr. 482, 484.  At the appointment with Dr.

Fucci, Plaintiff underwent a clinical interview and testing; Dr. Fucci prepared a psychological

evaluation that was submitted in connection with Plaintiff's SSI/DIB applications.  Tr. 550-60.

In May 2012, Plaintiff had a single appointment with Dr. Constantine Vafidis, a primary

care physician at Atmed; she complained of diffuse pain and numbness and that the medication

for fibromyalgia was not working as well as it had in the past.  Tr. 431-32.  He switched her from

Savella to Ultram.  Tr. 431.  In June 2012, Plaintiff began to see psychiatrist Dr. George

---

[7] At the hearing, Plaintiff explained that this work is a reference to the logging on her farm.  Tr. 63, 75.

[8] This appears to be the only record from Ms. Culbert; it is unclear if she is a psychiatrist, psychologist, nurse or
social worker.

Southiere for treatment for substance abuse. He diagnosed sedative hypnotic dependence and advised Plaintiff to taper off all such medications. Tr. 567. At his recommendation, Plaintiff attended a sedative hypnotic addiction program from mid-June to mid-July 2012. At discharge, staff noted, "[Plaintiff] made progress and developed insight into her addiction. [She] is continuing to develop sober support network and appears to be effectively processing though difficult life situations [with]out use of drugs in a healthy manner." Tr. 571. At her August appointment with Dr. Southiere, he noted, "doing well." Tr. 573.

### B. Opinion Evidence

In May 2011, state agency psychologist Dr. Jeffrey Hughes reviewed Plaintiff's medical records and confirmed that she suffers from anxiety and substance addiction disorders. Tr. 108-09. Based on this review, he concluded that her severe panic attacks result from the regular use of an addictive substance and that, notwithstanding her alcohol-induced anxiety, she suffers only mild difficulties in concentration, persistence and pace, moderate difficulties in social functioning and no restriction in her activities of daily living, although he did find one or two episodes of decompensation. Tr. 109. His Step Two conclusion was that her anxiety would be non-severe in the absence of alcohol use; further, based on her description of her activities of daily living, he found her statements about the severity of her pain and symptoms only partially credible. Tr. 109-10. His opinion regarding her residual functional capacity ("RFC") included only moderate limits on her ability to understand and remember detailed instructions, to sustain attention and concentration and to get along with co-workers, supervisors and the public and only mild limits on her ability to adapt. Tr. 110-11. In July 2011, state agency physician Dr. Donn Quinn also examined the medical record; focusing on the only medical opinion from a rheumatologist during the period of disability (the single illegible record from Dr. Toder), he

noted the diagnosis of fibromyalgia based on trigger points, but observed that Plaintiff had normal range of motion in all joints and normal grip strength. Based on his review of the record, he concluded, "impairment not severe." Tr. 108. He did not opine to Plaintiff's RFC. Id.

In reliance on these opinions and the other evidence in the record, on July 7, 2011, Plaintiff's applications were denied initially both because her condition was not sufficiently severe to keep her from working and because substance abuse was a contributing factor material to her only severe impairment. Tr. 103.

In connection with reconsideration, an opinion was procured in September 2011 from state agency psychologist Dr. J. Stephen Clifford; he affirmed Dr. Hughes's opinion that Plaintiff's limitations are not significant and that alcohol abuse is a material factor. Tr. 121-25. In October 2011, state agency physician Dr. Youssef Georgy reviewed all of the evidence in the record. He noted the absence of evidence of trigger points, fatigue, hyaluronic acid or synovitis, and affirmed Dr. Quinn's opinion that the condition diagnosed as fibromyalgia is not severe. Tr. 120-21.

Beginning in October 2011, Plaintiff began to submit what would become seven opinions procured from three non-acceptable medical source treating providers and from two acceptable medical source providers, one treating, one not, both of whom she saw only once.

The first two, dated October 3 and 19, 2011, respectively, were a physical RFC from Nurse Benson and a mental RFC from Nurse Rosa. In her evaluation, Nurse Benson opines that Plaintiff can barely sit, walk or stand (total capacity for each one to two hours), that her left side extremities and her right feet/legs cannot be used for any repetitive action and that she cannot lift or carry more than ten pounds occasionally. Id. Nurse Rosa's opinion is better developed; she attributes Plaintiff's panic attacks, mood swings, impulsivity, pressured speech, flight of idea and

depressive episodes to bipolar and panic disorder, "[a]part from substance abuse," and opines that, in the absence of substance abuse, Plaintiff would not be able to work full time.  Tr. 423. Her RFC concludes that, apart from substance abuse, her activities of daily living, ability to respond to coworkers and to customary work pressures are moderately severely impaired, her ability to perform complex, repetitive and varied tasks and respond to supervision are moderately impaired, while her ability to relate to others, carry out instructions and perform simple tasks are only mildly impaired.  Tr. 421-22.

Reconsideration was denied on October 25, 2011.  Plaintiff asked for a hearing before an ALJ; while waiting, she submitted a flurry of additional opinions.  First, her chiropractor Dr. Puth completed a pain questionnaire indicating moderate pain caused by degenerative disc disease, as diagnosed by an x-ray and MRI.  Tr. 420.  In November 2011, the chiropractor filled in a "Physical Capacity Evaluation," which is identical to the one prepared in early October by Nurse Benson.  Compare Tr. 424, with Tr. 425.  Next, on July 26, 2012, non-treating psychologist Dr. Christina Fucci signed a lengthy "Psychological Evaluation" based on diagnostic testing and a clinical interview.  Tr. 550-60.  She observed that Plaintiff was of "predominantly euthymic mood" with a high degree of persistence.  Tr. 550.  Testing demonstrated memory in high average range, "intact abilities when required to think flexibly, inhibit a response, and use planning and problem solving skills," high average cognitive abilities, with symptoms of anxiety and depression.  Tr. 551-53.  Dr. Fucci noted that "[t]he pattern of responding also reflected over-reporting and a high degree of stress and limited ability to cope with everyday stresses."  Tr. 553.  The report records diagnostic impressions of bipolar and anxiety disorders, but not ADHD, which was noted as "continue to rule out," based on Plaintiff's

strong performance on tasks requiring executive functioning.  Id.  Dr. Fucci assigned a GAF

score of 50.[9]  Tr. 554.

In October 2012, Nurse Rosa submitted a new mental RFC assessment and responses to a

functional questionnaire.  The opinion scores most of Plaintiff's functions as not limited or

moderately limited; she opined to marked limitations only as to attention and concentration, the

ability to complete a normal workday, the ability to interact with the public and to travel in

unfamiliar places.  Tr. 541-42.  In the responses to the questionnaire, Nurse Rosa found Plaintiff

to be moderately severely limited in her ability to respond to supervision, co-workers and work

pressures; all other functional limits were rated as mild or moderate.  Tr. 544-45.  Nevertheless,

she found that Plaintiff would be absent more than three days per month and therefore cannot

sustain full time employment.  Tr. 546.  Unlike her first opinion, Nurse Benson's 2012 RFC does

not opine on the relationship of Plaintiff's impairments to substance abuse.

The last opinion, signed in October 2012,[10] is a pain questionnaire prepared by Dr.

Vafidis, who saw Plaintiff once in May 2012.  He indicated that she reported "moderately-

severe" pain secondary to fibromyalgia, and opined that it would completely preclude sustained

concentration and would cause her to miss more than four days of work each month.  Tr. 426.

## II.  **Travel of the Case**

Plaintiff protectively filed applications for DIB and SSI in January 2011, alleging

disability beginning June 19, 2009.  Tr. 228-29.  They were denied initially and on

reconsideration.  Tr. 115-16, 139-40.  Based on Plaintiff's request, Tr. 159, on November 14,

---

[9] See n.4, *supra*.

[10] Doubtless because of the nearly illegible date below Dr. Vafidis's signature, both parties refer to this pain opinion as having been prepared in 2011.  However, the fax line at the top is "Nov 2, 2012," and it is listed in the record as a report dated October 30, 2012.  See Tr. 426.  More significant, Dr. Vafidis's only treating contact with Plaintiff was in May 2012.  Accordingly, I find that the proper date is 2012, not 2011.

2012, the ALJ held a hearing at which Plaintiff, represented by counsel, and a vocational expert ("VE") appeared and testified. Tr. 45-92. On December 4, 2012, the ALJ issued a decision finding Plaintiff not disabled. Tr. 24-38. The Appeals Council declined review, making the ALJ's decision the Commissioner's final decision, Tr. 6-8, subject to review by this Court under 42 U.S.C. §§ 405(g) and 1383(c). Plaintiff timely filed this action.

## III.   **The ALJ's Hearing and Decision**

At the hearing, Plaintiff testified that she continued course work on her Ph.D. through August 2010, part-time after 2008. Tr. 54. She claimed to have a driver's license and said that her panic attacks are the only reason for not driving. Tr. 55. Since onset, she tried to do paperwork and filing at Murphy's to help her mother, but made a mess. Tr. 58-59. Otherwise, she hangs around and does not work except to carry a few dishes every once in a while; she gave up all paid work after an altercation in the dining room with a rude customer. Tr. 60-62. She also described the logging activities on her farm for which she is responsible; she claimed the net income is not substantial. Tr. 63, 75-76

Plaintiff explained that she cannot work because of degenerative disc disease in her neck and fibromyalgia; she described pain in her neck, left side, shoulder, chest, hips and right leg and claims that it has caused her to be hospitalized and to have been "in walk-ins two to three times a week every week for a year and a half trying to fight to, to – because of the balance of the medication."[11] Tr. 67. Because of her mental impairments, she testified that she experiences rage and anger, extreme mood and energy swings and sleep problems. Tr. 68-69, 79. She said she drank alcohol when she went off her medication in 2010, but had stopped drinking as of July 2011; in all, she has been arrested for drunk driving three times, most recently in July 2011 resulting in a sentence of home confinement that ended in September 2012. Tr. 71-72, 74. In

[11] The record is devoid of evidence supporting this testimony.

explaining her daily activities, she testified that she cares for her dogs, takes rides with her father, regularly meeting him for coffee and accompanying him to his doctor appointments, does yoga, meditates, attends women's groups, cleans her house, reads ("mostly non-fiction, history"), writes in her journal, gardens ("growing herbs") and goes regularly to AA and to her chiropractor. Tr. 61, 76-77, 82-83. Her friends come to visit her; "they've been very supportive," since she does not drive. Tr. 55, 77. Plaintiff said she is dating, but that she finds relationships difficult. Tr. 84.

The VE testified in response to a hypothetical question posed by the ALJ regarding the work available to an individual with Plaintiff's age, education and experience, without exertional limits, but with limits on the ability to perform more than simple, routine, repetitive tasks and limited to superficial interaction with coworkers and supervisors, and no contact with the public. Tr. 88. The VE said that there would be jobs at both the medium and light levels, including janitorial work, packager and light cleaning. Tr. 88-89. However, if the individual were unable to sit, stand or walk for more than two hours, all work would be precluded. Tr. 89. Similarly, if the individual either could not sustain attention and concentration for even simple tasks or could not interact at all with others or could not tolerate customary work pressures, any of those limits would preclude all work. Tr. 90

The ALJ rendered his decision under the well-established five-step sequential evaluation process. See 20 C.F.R. § 404.1520.[12] At Step One, despite the many references to work after onset, he gave Plaintiff the benefit of the doubt and found she had not engaged in substantial gainful activity since the alleged onset date. Tr. 27. At Step Two, he found Plaintiff had severe

---

[12] The Social Security Administration has promulgated identical sets of regulations governing eligibility for DIB and SSI. See McDonald v. Sec'y of Health & Human Servs., 795 F.2d 1118, 1120 n.1 (1st Cir. 1986). For simplicity, I cite only to the DIB regulations. See id.

impairments consisting of "adjustment disorder with mixed anxiety and depressed mood; bipolar disorder, not otherwise specified; generalized anxiety disorder; panic disorder without agoraphobia; alcohol abuse/dependence; and sedative hypnotic dependence." Tr. 27-29. However, he questioned the diagnosis of fibromyalgia and found the pain limitations non-severe based on the opinions of the two state agency consulting physicians. Similarly, he found that tsetse syndrome and intercostal neuritis are non-severe because the only treatment was prior to onset and that Plaintiff's mild cervical spine issues are non-severe because all of the clinical examination and diagnostic testing revealed at most mild findings. Tr. 28-29.

At Step Three, the ALJ found Plaintiff's impairments did not meet or medically equal any of impairments under the Listing of Impairments. Tr. 30. He then determined that Plaintiff retains the RFC to perform work at all exertional levels, but with certain non-exertional limitations, including only simple, repetitive tasks, no public contact, only occasional contact with co-workers and no team oriented tasks. Tr. 31-36. At Step Four, the ALJ found Plaintiff unable to perform past relevant work. Tr. 36. However, at Step Five, based on the testimony of the VE, the ALJ found that Plaintiff could perform a significant number of other jobs. Tr. 37. Accordingly, the ALJ concluded Plaintiff was not disabled. Tr. 37-38. With the finding of no disability, the ALJ did not explore whether substance abuse is a contributing material factor to her limitations.

## IV.   Issues Presented

Plaintiff's motion for reversal rests on her arguments that the ALJ committed reversible error by failing to find that fibromyalgia and other physical conditions are severe impairments at Step Two and by giving insufficient weight to the opinions of the psychiatric nurse, Nurse Rosa.

## V.      Standard of Review

The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g).  Substantial evidence is more than a scintilla – that is, the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion.  Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (per curiam); Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981); Brown v. Apfel, 71 F. Supp. 2d 28, 30 (D.R.I. 1999).  Once the Court concludes that the decision is supported by substantial evidence, the Commissioner must be affirmed, even if the Court would have reached a contrary result as finder of fact.  Rodriguez Pagan v. Sec'y of Health & Human Servs., 819 F.2d 1, 3 (1st Cir. 1987); see also Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991); Lizotte v. Sec'y of Health & Human Servs., 654 F.2d 127, 128 (1st Cir. 1981).

The determination of substantiality is based upon an evaluation of the record as a whole. Brown, 71 F. Supp. 2d at 30; see also Frustaglia v. Sec'y of Health & Human Servs., 829 F.2d 192, 195 (1st Cir. 1987); Parker v. Bowen, 793 F.2d 1177, 1180 (11th Cir. 1986) (court also must consider evidence detracting from evidence on which Commissioner relied).  Thus, the Court's role in reviewing the Commissioner's decision is limited.  Brown, 71 F. Supp. 2d at 30. The Court does not reinterpret the evidence or otherwise substitute its own judgment for that of the Commissioner.  Id. at 30-31 (citing Colon v. Sec'y of Health & Human Servs., 877 F.2d 148, 153 (1st Cir. 1989)).  "[T]he resolution of conflicts in the evidence is for the Commissioner, not the courts."  Id. at 31 (citing Richardson v. Perales, 402 U.S. 389, 399 (1971)).  A claimant's complaints alone cannot provide a basis for entitlement when they are not supported by medical

evidence.  See Avery v. Sec'y of Health & Human Servs., 797 F.2d 19, 20-21 (1st Cir. 1986); 20 C.F.R. § 404.1529(a).

The Court must reverse the ALJ's decision on plenary review, if the ALJ applies incorrect law, or if the ALJ fails to provide the Court with sufficient reasoning to determine that the law was applied properly.  Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999) (per curiam); accord Cornelius v. Sullivan, 936 F.2d 1143, 1145-46 (11th Cir. 1991).  Remand is unnecessary where all of the essential evidence was before the Appeals Council when it denied review, and the evidence establishes without any doubt that the claimant was disabled.  Seavey v. Barnhart, 276 F.3d 1, 11 (1st Cir. 2001) (citing Mowery v. Heckler, 771 F.2d 966, 973 (6th Cir. 1985)).

The Court may remand a case to the Commissioner for a rehearing under Sentence Four of 42 U.S.C. § 405(g); under Sentence Six of 42 U.S.C. § 405(g); or under both sentences. Jackson v. Chater, 99 F.3d 1086, 1097-98 (11th Cir. 1996).

To remand under Sentence Four, the Court must either find that the Commissioner's decision is not supported by substantial evidence, or that the Commissioner incorrectly applied the law relevant to the disability claim.  Seavey, 276 F.3d at 9; accord Brenem v. Harris, 621 F.2d 688, 690 (5th Cir. 1980) (remand appropriate where record was insufficient to affirm, but also was insufficient for district court to find claimant disabled).  Where the Court cannot discern the basis for the Commissioner's decision, a Sentence Four remand may be appropriate to allow an explanation of the basis for the decision.  Freeman v. Barnhart, 274 F.3d 606, 609-10 (1st Cir. 2001).  On remand under Sentence Four, the ALJ should review the case on a complete record, including any new material evidence.  Diorio v. Heckler, 721 F.2d 726, 729 (11th Cir. 1983) (necessary for ALJ on remand to consider psychiatric report tendered to Appeals Council).  After

a Sentence Four remand, the Court enters a final and appealable judgment immediately, and thus loses jurisdiction. Freeman, 274 F.3d at 610.

In contrast, Sentence Six of 42 U.S.C. § 405(g) provides:

The court . . . may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding.

42 U.S.C. § 405(g). To remand under Sentence Six, the claimant must establish: (1) that there is new, non-cumulative evidence; (2) that the evidence is material, relevant and probative so that there is a reasonable possibility that it would change the administrative result; and (3) there is good cause for failure to submit the evidence at the administrative level. See Evangelista v. Sec'y of Health & Human Servs., 826 F.2d 136, 139-43 (1st Cir. 1987).

With a Sentence Six remand, the parties must return to the Court after remand to file modified findings of fact. Jackson, 99 F.3d at 1095 (citing Melkonyan v. Sullivan, 501 U.S. 89, 98 (1991)). The Court retains jurisdiction pending remand and does not enter a final judgment until after the completion of remand proceedings. Id.

## VI.     Disability Determination

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 416(I); 20 C.F.R. § 404.1505. The impairment must be severe, making the claimant unable to do previous work, or any other substantial gainful activity which exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-1511.

## A.      Treating Physicians and Other Sources

Substantial weight should be given to the opinion, diagnosis and medical evidence of a treating physician unless there are good reasons to do otherwise.  See Rohrberg v. Apfel, 26 F. Supp. 2d 303, 311 (D. Mass. 1998); 20 C.F.R. § 404.1527(c).  If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight.  Konuch v. Astrue, No. 11-193L, 2012 WL 5032667, at *4-5 (D.R.I. Sept. 13, 2012); 20 C.F.R. § 404.1527(c)(2).  The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory.  See Keating v. Sec'y of Health & Human Servs., 848 F.2d 271, 275-76 (1st Cir. 1988).  The ALJ's decision must articulate the weight given, providing "good reasons" for the determination.  See Sargent v. Astrue, No. CA 11–220 ML, 2012 WL 5413132, at *7-8, 11-12 (D.R.I. Sept. 20, 2012) (where ALJ failed to point to evidence to support weight accorded treating source opinion, court will not speculate and try to glean from the record; remand so that ALJ can explicitly set forth findings).

Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments.  See Wheeler v. Heckler, 784 F.2d 1073, 1075 (11th Cir. 1986).  When a treating physician's opinion does not warrant controlling weight, the ALJ must nevertheless weigh the medical opinion based on the (1) length of the treatment relationship and the frequency of examination; (2) nature and extent of the treatment relationship; (3) medical evidence supporting the opinion; (4) consistency with the record as a whole; (5) specialization in the medical conditions at issue; and (6) other factors which tend to support or contradict the

opinion.  20 C.F.R § 404.1527(c).  However, a treating physician's opinion is generally entitled to more weight than a consulting physician's opinion.  See 20 C.F.R. § 404.1527(c)(2).

A treating source who is not a licensed physician or psychologist[13] is not an "acceptable medical source."  20 C.F.R. § 404.1513; SSR 06-03p, 2006 WL 2263437, at *2 (Aug. 9, 2006).  Only an acceptable medical source may provide a medical opinion entitled to controlling weight to establish the existence of a medically determinable impairment.  SSR 06-03p, 2006 WL 2263437, at *2.  An "other source," such as a nurse practitioner or licensed clinical social worker, is not an "acceptable medical source," and cannot establish the existence of a medically determinable impairment, though such a source may provide insight into the severity of an impairment, including its impact on the individual's ability to function.  Id. at *2-3.  In general, an opinion from an "other source" is not entitled to the same deference as an opinion from a treating physician or psychologist.  Id. at *5.  Nevertheless, the opinions of medical sources who are not "acceptable medical sources" are important and should be evaluated on key issues such as severity and functional effects, along with other relevant evidence in the file.  Id. at *4.

The ALJ is required to review all of the medical findings and other evidence that support a medical source's statement that a claimant is disabled.  However, the ALJ is responsible for making the ultimate determination about whether a claimant meets the statutory definition of disability.  20 C.F.R. § 404.1527(d).  The ALJ is not required to give any special significance to the status of a physician as treating or non-treating in weighing an opinion on whether the claimant meets a listed impairment, a claimant's residual functional capacity ("RFC"), see 20 C.F.R. §§ 404.1545-1546, or the application of vocational factors because that ultimate

---

[13] The regulations recognize other categories of providers as acceptable medical sources for certain impairments; for example, a licensed optometrist is acceptable for measurement of visual acuity and visual fields.  SSR 06-03p, 2006 WL 2263437, at *1.

determination is the province of the Commissioner.  20 C.F.R. § 404.1527(d); see also Dudley v. Sec'y of Health & Human Servs., 816 F.2d 792, 794 (1st Cir. 1987) (per curiam).

**B.      The Five-Step Evaluation**

The ALJ must follow five steps in evaluating a claim of disability.  See 20 C.F.R. § 404.1520.  First, if a claimant is working at a substantial gainful activity, the claimant is not disabled.  20 C.F.R. § 404.1520(b).  Second, if a claimant does not have any impairment or combination of impairments that significantly limit physical or mental ability to do basic work activities, then the claimant does not have a severe impairment and is not disabled.  Id. § 404.1520(c).  Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Appendix 1, the claimant is disabled.  Id. § 404.1520(d).  Fourth, if a claimant's impairments do not prevent doing past relevant work, the claimant is not disabled.  Id. § 404.1520(e)-(f).  Fifth, if a claimant's impairments (considering RFC, age, education and past work) prevent doing other work that exists in the local or national economy, a finding of disabled is warranted.  Id. § 404.1520(g).  Significantly, the claimant bears the burden of proof at Steps One through Four, but the Commissioner bears the burden at Step Five.  Wells v. Barnhart, 267 F. Supp. 2d 138, 144 (D. Mass. 2003).

In determining whether a claimant's physical and mental impairments are sufficiently severe, the ALJ must consider the combined effect of all of the claimant's impairments and must consider any medically severe combination of impairments throughout the disability determination process.  42 U.S.C. § 423(d)(2)(B).  Accordingly, the ALJ must make specific and well-articulated findings as to the effect of a combination of impairments when determining whether an individual is disabled.  Davis v. Shalala, 985 F.2d 528, 534 (11th Cir. 1993).

The claimant must prove the existence of a disability on or before the last day of insured status for the purposes of disability benefits. Deblois, 686 F.2d at 79; 42 U.S.C. § 416(i)(3). If a claimant becomes disabled after loss of insured status, the claim for disability benefits must be denied despite disability. Cruz Rivera v. Sec'y of Health & Human Servs., 818 F.2d 96, 97 (1st Cir. 1986).

### C.   Pain

"Pain can constitute a significant non-exertional impairment." Nguyen, 172 F.3d at 36. Congress has determined that a claimant will not be considered disabled unless medical and other evidence (e.g., medical signs and laboratory findings) is furnished showing the existence of a medical impairment which could reasonably be expected to produce the pain or symptoms alleged. 42 U.S.C. § 423(d)(5)(A). The ALJ must consider all of a claimant's statements about symptoms, including pain, and determine the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence. 20 C.F.R. §§ 404.1528, 416.928. In determining whether the medical signs and laboratory findings show medical impairments which reasonably could be expected to produce the pain alleged, the ALJ must apply the First Circuit's six-part pain analysis and consider the listed factors. Avery, 797 F.2d at 29; Gullon v. Astrue, No. 11-cv-099ML, 2011 WL 6748498, at *5-6 (D.R.I. Nov. 30, 2011). An individual's statement as to pain is not, by itself, conclusive of disability. 42 U.S.C. § 423(d)(5)(A). Guidance in assessing the credibility of the claimant's statement is provided by the Commissioner's 1996 ruling. SSR 96-7p, 1996 WL 374186 (July 2, 1996). Credibility of an individual's statement about pain or other symptoms and their functional effects is the degree to which the statement can be believed and accepted as true; in making this determination, the ALJ must consider the entire case record and may find that all, only some, or none of an individual's

allegations are credible.  Id. at *4.  One strong indication of credibility is the consistency of the claimant's statements, both internally and with other information in the record.  Id. at *5-6.

### D.     Evaluation of Mental Illness Claims

The evaluation of a claim of disability based on mental illness requires use of a psychiatric review technique that assesses impairment in four work-related functions: (1) activities of daily living; (2) social functioning; (3) concentration, persistence or pace; and (4) episodes of decompensation.  20 C.F.R. § 404.1520a(c)(3).  The review technique is used to rate the severity of mental impairments at Steps Two and Three of the sequential evaluation process, and also serves as the backdrop for the more detailed mental RFC assessment at Step Four.  See, e.g., Wells v. Colvin, 727 F.3d 1061, 1069 (10th Cir. 2013); SSR 96-8p, 1996 WL 371184 (July 2, 1996).  The ALJ must incorporate pertinent findings and conclusions based on the technique into his decision and must include a specific finding as to the degree of limitation in each of the four functional areas.  20 C.F.R. § 404.1520a(e)(4); Carolyn Kubitschek & Jon Dubin, Social Security Disability Law & Procedure in Federal Court § 5:38 (2014).

### E.     Capacity to Perform Other Work

Once the ALJ finds that a claimant cannot return to the prior work, the burden of proof shifts to the Commissioner to establish that the claimant could perform other work that exists in the local or national economy.  Seavey, 276 F.3d at 5.  To meet this burden, the ALJ must develop a full record regarding the vocational opportunities available to a claimant.  Allen v. Sullivan, 880 F.2d 1200, 1201 (11th Cir. 1989).  This burden may sometimes be met through reliance on the Medical-Vocational Guidelines (the "grids").  Seavey, 276 F.3d at 5.  Exclusive reliance on the grids is appropriate where the claimant suffers primarily from an exertional impairment, without significant non-exertional factors.  Id. (exclusive reliance on the grids is

appropriate in cases involving only exertional impairments, impairments which place limits on

an individual's ability to meet job strength requirements). Exclusive reliance is not appropriate

when a claimant is unable to perform a full range of work at a given RFC or when a claimant has

a non-exertional impairment that significantly limits basic work skills. Nguyen, 172 F.3d at 36.

In almost all of such cases, the Commissioner's burden can be met only through the use of a

vocational expert. Heggarty v. Sullivan, 947 F.2d 990, 996 (1st Cir. 1991). It is only when the

claimant can clearly do unlimited types of work at a given RFC that it is unnecessary to call a

vocational expert to establish whether the claimant can perform work which exists in the national

economy. See Ferguson v. Schweiker, 641 F.2d 243, 248 (5th Cir. 1981). In any event, the ALJ

must make a specific finding as to whether the non-exertional limitations are severe enough to

preclude a wide range of employment at the given RFC indicated by the exertional limitations.

Merola v. Astrue, C.A. No. 11-536A, 2012 WL 4482364, at *5 (D.R.I. Sept. 26, 2012).

 **F. Making Credibility Determinations**

 Where an ALJ decides not to credit a claimant's testimony, the ALJ must articulate

specific and adequate reasons for doing so, or the record must be obvious as to the credibility

finding. See Da Rosa v. Sec'y of Health & Human Servs., 803 F.2d 24, 26 (1st Cir. 1986);

Rohrberg, 26 F. Supp. 2d at 309-10. A reviewing court will not disturb a clearly articulated

credibility finding with substantial supporting evidence in the record. See Frustaglia, 829 F.2d at

195. A lack of a sufficiently explicit credibility finding becomes a ground for remand when

credibility is critical to the outcome of the case. See Smallwood v. Schweiker, 681 F.2d 1349,

1352 (11th Cir. 1982). If proof of disability is based on subjective evidence and a credibility

determination is, therefore, critical to the decision, "the ALJ must either explicitly discredit such

testimony or the implication must be so clear as to amount to a specific credibility finding."

Foote v. Chater, 67 F.3d 1553, 1562 (11th Cir. 1995) (quoting Tieniber v. Heckler, 720 F.2d 1251, 1255 (11th Cir. 1983)).

### G. Substance Abuse

Disability benefits are not available if alcohol or drug abuse is a contributing factor material to the determination of disability. 42 U.S.C. § 423(d)(2)(C); Brown v. Apfel, 71 F. Supp. 2d at 29; 20 C.F.R. § 404.1535(b). If the claimant is disabled and there is medical evidence of alcoholism or substance addiction, the ALJ must determine the impact of the addiction on the claimant's disability. See 42 U.S.C. § 423(d)(2)(C); 20 C.F.R. § 404.1535(a). "The 'key factor' to be considered, in fact the only factor mentioned in the regulations, is whether the claimant would still be disabled absent the drug addiction or alcoholism." Brown v. Apfel, 71 F. Supp. 2d at 35; see also 20 C.F.R. § 404.1535(b)(1). Effective on March 22, 2013, a new policy interpretation issued clarifying how the Commissioner determines whether drug addiction and alcoholism is material to the finding that a claimant is disabled, requiring that benefits be denied. SSR 13-2p, 2013 WL 621536 (Feb. 20, 2013).

The ALJ must first conduct the five-step inquiry taking into account all impairments, including drug and alcohol addiction. Brown, 71 F. Supp. 2d at 29. If the ALJ finds the claimant is not disabled, the process ends. SSR 13-2p, 2013 WL 621536, at *10; Brueggemann v. Barnhart, 348 F.3d 689, 694 (8th Cir. 2003); Williams v. Barnhart, 338 F. Supp. 2d 849, 862 (M.D. Tenn. 2004). If the ALJ finds the claimant disabled, the analysis "must go one step further" and determine whether the claimant would still be disabled if the claimant stopped abusing drugs or alcohol. Brown v. Apfel, 71 F. Supp. 2d at 35. Congress mandated the extra step because "it is important . . . not to have the Social Security System subsidize [substance abuse]." Id. at 29. An impairment caused by past substance abuse may be considered disabling

only if the impairment remains after the claimant stops substance abuse.  Pettit v. Apfel, 218

F.3d 901, 903 (8th Cir. 2000); Hamison v. Halter, 169 F. Supp. 2d 1066, 1069 (D. Minn. 2001).

The question of materiality of drug addiction or alcoholism is reserved to the

Commissioner.  Ambrose v. Astrue, No. 07-84-B-W, 2008 WL 648957, at *5 (D. Me. Mar. 5,

2008).  The Commissioner may base the materiality finding on record evidence during periods of

sobriety.  Cage v. Comm'r of Soc. Sec., 692 F.3d 118, 126-27 (2d Cir. 2012); Schell v. Astrue,

2012 WL 745024, at *6 (D. Mass. Mar. 7, 2012); see also Vester v. Barnhart, 416 F.3d 886, 891

(8th Cir. 2005) (Commissioner may find that claimant is not disabled if Commissioner is

presented with evidence that claimant has demonstrated ability to work during periods of

sobriety).  When the claimant never achieves sobriety, the materiality determination will

necessarily be hypothetical and therefore more difficult; the claimant cannot avoid a finding of

no disability simply by continuing substance abuse.  SSR 13-2p, 2013 WL 621536, at *9; Evans

v. Astrue, CA 11-146S, 2012 WL 4482354, at *2 (D.R.I. Sept. 26, 2012).

VII.    **Application and Analysis**

A.    **ALJ's Step Two Finding of No Severe Physical Impairments**

At Step Two of the sequential evaluation, the ALJ must determine whether the claimant

has any "severe" medically determinable impairment.  20 C.F.R. § 404.1520(a)(4)(ii).  This is a

two-step, requiring the ALJ first to examine whether the claimant has sustained her burden of

establishing such impairment; if she has, the second inquiry is whether it is severe.  See

Freeman, 274 F.3d at 608 (burden of establishing impairment that is severe for purposes of Step

Two rests on claimant).  As our Circuit has held, the severity step is a "*de minimis* standard . . .

designed to do no more than screen out groundless claims."  Lisi v. Apfel, 111 F. Supp. 2d 103,

110 (D.R.I. 2000) (citing McDonald v. Sec'y of Health & Human Servs., 795 F.2d 1118, 1124

(1st Cir. 1986)).  Pointing to the diagnoses of fibromyalgia[14] by the two rheumatologists, Dr.

Cohen and Dr. Toder, and to the opinions of Dr. Puth, Dr. Vafidis and Nurse Benson regarding

the pain and functional limitations it has caused, Plaintiff contends that she has sustained her

burden of establishing that fibromyalgia is a severe medically determinable impairment and that

the ALJ committed an array of errors in finding that she did not.[15]

In response, the Commissioner points to the ALJ's finding, based on his examination of

the notes of Dr. Cohen and Dr. Toder and on the opinions of the state agency physicians, Dr.

Quinn and Dr. Georgy, that it cannot be ascertained whether either Dr. Cohen or Dr. Toder found

at least eleven tender points bilaterally above and below the waist, which is required to establish

a diagnosis of fibromyalgia.  Tr. 27.  In reliance on this finding, the Commissioner contends that

the ALJ properly concluded that the record does not establish fibromyalgia as a medically

determinable impairment.  Id.  The Commissioner also contends that the ALJ's conclusion that

"fibromyalgia is a non-severe impairment" is grounded in the well-supported opinions of the

state agency physicians.  Tr. 27-28, 108, 121.  Finally, the Commissioner argues that, even if the

ALJ erred at Step Two in rejecting fibromyalgia as a severe impairment, the error is harmless

because the ALJ found other severe impairments at Step Two.  Tr. 27.  As a result, the analysis

continued to Step Four, when the ALJ specifically considered the functional limitations

attributable to pain; based on the unchallenged finding that Plaintiff was not fully credible, the

---

[14] Fibromyalgia is "[a] syndrome of chronic pain of musculoskeletal origin but uncertain cause."  Johnson v. Astrue, 597 F.3d 409, 410 (1st Cir. 2009).  The principal symptom is "pain all over," with multiple tender spots at up to eighteen (and at least eleven) fixed locations on the body that cause the patient to flinch when firmly pressed. Sarchet v. Chater, 78 F.3d 305, 306-07 (7th Cir. 1996).

[15] Plaintiff's brief mentions in passing "other physical conditions," apparently a reference to the ALJ's rejection of tsetse syndrome, intercostal neuritis and mild abnormalities of the cervical spine as severe impairments at Step Two. See ECF No. 10 at 3, 18.  However, Plaintiff has utterly failed to develop these arguments, leaving this Court to speculate regarding what might be the claim of error tainting this aspect of the ALJ's Step Two determination.  It is well settled that, under such circumstances, this Court should treat these arguments as waived.  A.J. Amer Agency, Inc. v. Astonish Results, LLC, No. CA 12-351 S, 2014 WL 3496964, at *26 n.25 (D.R.I. July 11, 2014).  They will not be discussed further.

manifold evidence of her many activities and a thorough review of all of the medical and opinion evidence, the ALJ crafted an RFC resulting in the decision of no disability.  Tr. 31, 34.

To untangle these strands requires a look at the principles developed to aid adjudicators facing a claim of disability based on fibromyalgia.  The starting point is the well-recognized proposition that fibromyalgia is a very real impairment that can truly be disabling, but also that the subjective nature of the diagnostic criteria make it one that can be faked or exaggerated by individuals seeking to collect benefits to which they are not entitled.  Sarchet v. Chater, 78 F.3d 305, 306-07 (7th Cir. 1996) (fibromyalgia symptoms are easy to fake, making it difficult to diagnose; some people may have such a severe case of fibromyalgia as to be totally disabled from working, but most do not); Charpentier v. Colvin, No. CA 12-312 S, 2014 WL 575724, at *13 (D.R.I. Feb. 11, 2014) (credibility particularly important in fibromyalgia cases).  In response to this dilemma, the Social Security Administration recently issued a Policy Interpretation, effective as of July 25, 2012, entitled "Evaluation of Fibromyalgia," for the purpose of ensuring that there is sufficient objective evidence to support a finding of disability.  SSR 12-2p, 2012 WL 3104869, at *1 (July 25, 2012) ("SSR 12-2p").[16]  SSR 12-2p stipulates that the ALJ "cannot rely upon the physician's diagnosis alone."  Id. at *2.  Rather, the ALJ must examine whether the medical evidence establishes that the physician reviewed the person's medical history and conducted a physical exam.  Id.  For a diagnosis of fibromyalgia to constitute a medically determinable impairment, the ALJ must find that the physician has documented either the "A" criteria, which are listed in 1990 ACR Criteria for the Classification of Fibromyalgia and include widespread pain and at least eleven positive tender points, or the "B" criteria, which are listed in

---

[16] Because the ALJ issued his decision after the effective date of SSR 12-2p, it is applicable to this case.  Witt v. Colvin, No. CIV 14-4013, 2015 WL 1257438, at *23 (D.S.D. Mar. 18, 2015); see also Sloan v. Astrue, 499 F.3d 883, 889 (8th Cir. 2007) ("Generally, if an agency makes a policy change during the pendency of a claimant's appeal, the reviewing court should remand for the agency to determine whether the new policy affects its prior decision.").

2010 ACR Preliminary Diagnostic Criteria and include widespread pain coupled with repeated manifestations of six or more symptoms, such as fatigue, cognitive or memory problems ("fibro fog"), waking unrefreshed, depression, anxiety disorder or irritable bowel syndrome.  SSR 12-2p, 2012 WL 3104869, at *2-3.  SSR 12-2p emphasizes that "longitudinal records reflecting ongoing medical evaluation and treatment from acceptable medical sources are especially helpful."  Id. at *3 (emphasis supplied).

The ALJ's conclusion that Plaintiff did not sustain her burden of proving the medically determinable impairment of fibromyalgia despite the medical opinions of two rheumatologists, Dr. Cohen and Dr. Toder, is somewhat tenuous.  The first confusing issue is Dr. Cohen; the ALJ says his notes do not reflect at least eleven tender points, Tr. 27, yet on the face of the record of his only appointment with Plaintiff there is a seemingly precise list that appears to hit the mark. Tr. 492.  The ALJ does not mention the most significant weaknesses in Plaintiff's reliance on Dr. Cohen – that his pre-onset diagnosis reflects a condition that did not limit Plaintiff's ability to work and that, based on a one-time visit, it lacks the longitudinal quality called for by SSR 12-2p.  On the other hand, the record confirms the ALJ's observation that the nearly illegible note of the only rheumatologist who saw Plaintiff during the period of alleged disability (Dr. Toder), also for a one-time visit, fails to list what body parts had tender points.  Tr. 27, 327.  However, this observation demonstrates only that Plaintiff did not meet the "A" criteria in SSR 12-2p; it ignores the "B" criteria.  Finally, the state agency physicians both comment explicitly on Dr. Toder's diagnosis, seemingly inconsistently, in that Dr. Quinn wrote "[h]ad (+) fibromyalgia trigger points," while Dr. Georgy wrote, "no evidence of trigger points."  Tr. 108, 120.  Neither mentions Dr. Cohen, perhaps because his observations were recorded prior to onset while

Plaintiff was still "work[ing] hard," Tr. 492, or perhaps because his treating note had not yet made its way into the record.

If Plaintiff could establish that this finding – that fibromyalgia was not established as a medically determinable impairment – was material to the determination of no disability, the confusion surrounding it is probably enough to require remand. Shinseki v. Sanders, 556 U.S. 396, 410 (2009) ("the party seeking reversal normally must explain why the erroneous ruling caused harm"); Perez Torres v. Sec'y of Health & Human Servs., 890 F.2d 1251, 1255 (1st Cir. 1989) ("Although the ALJ misread the record . . . we . . . find the error harmless"). She cannot, for two reasons.

First, whether or not fibromyalgia is a medically determinable impairment, the ALJ also found that it is not severe based on the opinions of Drs. Quinn and Georgy; as long as their opinions are grounded in substantial record evidence, the ALJ's reliance on them is not error. Tr. 29. More importantly, Step Two errors are harmless as long as the ALJ goes on to consider the limitations caused by the symptoms of the rejected impairment in the later analytical steps. Courtemanche v. Astrue, No. 10-427, 2011 WL 3438858, at *15 (D.R.I. July 14, 2011) (Step Two finding that particular impairment is not "severe" is irrelevant "absent any specific showing by [the claimant] of any particular functional limitations attributable to [that impairment] that the ALJ failed to consider in making his RFC finding"), adopted by 2011 WL 3421557 (Aug. 4, 2011); Portorreal v. Astrue, No. 07-296, 2008 WL 4681636, at *4 (D.R.I. Sept. 25, 2008) ("Because the ALJ found in [the claimant's] favor at Step Two, even if he had erroneously concluded that some of her other impairments were non-severe, any error was harmless.") (citation omitted), adopted by 2008 WL 4681636 (Oct. 21, 2008). Because the ALJ here expressly "considered all symptoms" and explicitly referenced pain in assessing the RFC, any

potential error at Step Two is harmless. Tr. 31. Accordingly, the final issue to examine is whether the building blocks for the Step Two severity and RFC determinations are tainted by error – that is, whether the ALJ's decision to afford substantial evidentiary weight to the state agency opinions, while according minimal weight to the opinions of primary care physician, Dr. Vafides, chiropractor, Dr. Puth, and Nurse Benson, is properly based on substantial evidence.

Dr. Vafidis is a primary care physician with Atmed, the clinic where Plaintiff's treating primary care doctor, Dr. Sadovnikoff, and Nurse Benson practice. He treated Plaintiff once, in May 2012, five months before completing the pain form. [17] Tr. 431-32. During his sole encounter, he accepted Plaintiff's subjective description of her pain and performed an examination that resulted in the observation that she appeared well with all normal findings. Tr. 431. With no observations or clinical tests to support the conclusion, his October 2011 "pain questionnaire" check-the-box form rates Plaintiff's self-reported pain symptoms as moderately severe, precluding sustained concentration and likely to cause absence from work more than four days per month. Tr. 426. There is no suggestion that he was aware of Plaintiff's extensive activities, which are so inconsistent with his opinion. Plaintiff counters that Dr. Vafidis should be deemed a longitudinal treating source because he worked at the same clinic as Dr. Sadovnikoff. This is simply wrong. Ott v. Colvin, No. 8:12-CV-71, 2013 WL 1316546, at *13 (D. Neb. Mar. 29, 2013) ("a provider does not become a 'treating provider' simply by sharing an office with another provider who regularly sees a patient"). There is no error in the ALJ's decision to afford Dr. Vafidis's opinion minimal weight.

By contrast with Dr. Vafidis, Nurse Benson, who submitted a one-page RFC form in October 2011, Tr. 425, is unquestionably a treating source, though as a non-physician, she is not an "acceptable medical source" and her opinion is not entitled to special deference. 20 C.F.R. §

---

[17] See n.10, *supra*.

404.1513(a); SSR 06-03p, 2006 WL 2263437, at *5. The ALJ declined to afford more than minimal weight to her opinion that Plaintiff could barely sit, walk or stand because of its inconsistency with Nurse Benson's own treating notes and with the balance of the overall record. Tr. 29. There is no error in this determination – Nurse Benson's notes record that Plaintiff was working at Murphy's, e.g., Tr. 347, 430, "[f]eels pretty good," Tr. 346, and "[f]eels much better," Tr. 348. Dr. Sadovnikoff, with whom Nurse Benson worked, made contemporaneous notations that Plaintiff exercised on the elliptical, "worked 81 hours in 4 days. Murphy's," and was "[w]ell-appearing." Tr. 354. While the ALJ also examined the inconsistency between Nurse Benson's opinion and Plaintiff's descriptions of her many activities, this is more than enough. The ALJ's decision to discount Nurse Benson's opinion is amply supported by the record.

The final set of opinions on which Plaintiff relies to support her contention that pain was a seriously limiting condition are those of the chiropractor, Dr. Puth. Tr. 420, 424. With good reason, Plaintiff does not labor long to rehabilitate them – Dr. Puth is a non-acceptable medical source, who opined only to moderate pain, inexplicably concluded that moderate pain would cause more than three days per month lost from work and signed a box-checked RFC that is an exact copy of the one completed by Nurse Benson. Tr. 420, 424-25. With skimpy treating notes that contain nothing to buttress these conclusions and a record otherwise replete with inconsistent evidence, the ALJ did not err in affording Dr. Puth's opinions little weight.

Plaintiff's last challenge attacks the ALJ's reliance on the state agency physicians, Drs. Quinn and Georgy, to whose opinions he afforded substantial weight. She argues that these opinions are flawed because they did not see Dr. Cohen's treating notes from his one-time visit with Plaintiff in 2008. Plaintiff is right that the state agencies physicians do not mention Dr. Cohen; however, the record does not clarify whether that is because Dr. Cohen's notes were not

yet in the file or because there was no need to discuss a diagnosis made well prior to onset during

a period when Plaintiff was "work[ing] hard." Tr. 492. Plaintiff's argument founders because

review of Dr. Cohen's record supports, and does not undermine, the conclusion of Drs. Quinn

and Georgy that Plaintiff's pain, whether caused by fibromyalgia or not, was far from disabling.

To conclude, I find that any error tainting the ALJ's Step Two determination regarding

fibromyalgia is harmless and that the ALJ's finding that pain did not cause disabling limitations

is well supported by substantial evidence in the record. I recommend that the Court affirm this

aspect of the ALJ's decision.

### B.    Weight Given to Opinion of the Psychiatric Nurse

In support of her claim that her mental health conditions are disabling impairments to

which substance abuse is not material, Plaintiff relies principally on two opinions proffered by

Nurse Rosa, the psychiatric nurse with QBH, who treated her beginning in May 2010 through

October 2012. Written on October 19, 2011, and on October 17, 2012, respectively, both opine

to a mental RFC with various moderately severe limitations caused by bipolar and panic/anxiety

disorder; in her 2011 opinion (but not 2012), Nurse Rosa concluded that Plaintiff's disabling

impairments would exist apart from substance abuse. Tr. 421-23, 544-46. Despite the length of

the treating relationship, the ALJ afforded minimal weight to these opinions not only because

Nurse Rosa is not an acceptable medical source, but also because they are inconsistent with both

the overall record and her own treating notes. Tr. 35-36, 329-37, 394-411.

For example, the opinion that Plaintiff has moderately severe impairments in her ability

to perform activities of daily living is directly contradicted by the reality reflected in Nurse

Rosa's treating notes that Plaintiff functioned effectively despite living first with her husband

and then competently living alone, caring for her dogs and tending to the grounds of her farm.

Tr. 329-30. Similarly, it is difficult to harmonize Nurse Rosa's opinions about Plaintiff's near complete inability to respond to work pressures or adapt to travel, with her own notes recording the completion of Plaintiff's Ph.D. and travel to Minnesota for the commencement ceremony.[18] Tr. 330. Nurse Rosa's opinion also clashes with Dr. Fucci's testing, which resulted in the conclusions that Plaintiff demonstrated a high degree of persistence and has "intact abilities when required to think flexibly, inhibit a response, and use planning and problem solving skills," as well as high average cognitive abilities. Tr. 553. Nurse Rosa did no testing herself to support her conclusion of extreme limitations with respect to concentration and attention; it is inconsistent with other record references; for example, the psychiatric staff at Kent Hospital opined, "concentration unremarkable." Tr. 310. Finally, Nurse Rosa's opinion that there is no link between Plaintiff's impairments and substance abuse is tainted by Plaintiff's lack of candor with her about the seriousness of her alcohol problem; for example, Plaintiff told Nurse Rosa that she was going on a spiritual retreat in Connecticut when the record is clear that she was checking herself into the detoxification program at Phoenix House in Rhode Island. Tr. 404, 498.

In rejecting Nurse Rosa's opinion that Plaintiff could not sustain employment as inconsistent with the overall record, the ALJ properly relied on the well-supported opinions of state agency psychologists Drs. Hughes and Clifford and focused on the complete absence of psychiatric hospitalizations, except for alcohol detoxification, as well as on Plaintiff's many activities, including working, the obtaining of a doctorate degree and her persistent commitment to the practice of yoga at home and in a studio. Tr. 36. The decision to afford minimal weight to these opinions is well supported by substantial evidence. I find no error and recommend that the ALJ's determination be affirmed.

---

[18] Nurse Rosa advised Plaintiff about medication strategies to use if she experienced panic attacks while traveling. Tr. 330. There is no suggestion that these strategies were not effective.

**VIII.** **Conclusion**

I recommend that Plaintiff's Motion to Reverse the Decision of the Commissioner (ECF No. 10) be DENIED and Defendant's Motion for Order Affirming the Decision of the Commissioner (ECF No. 14) be GRANTED.

Any objection to this report and recommendation must be specific and must be served and filed with the Clerk of the Court within fourteen (14) days after its service on the objecting party. See Fed. R. Civ. P. 72(b)(2); DRI LR Cv 72(d). Failure to file specific objections in a timely manner constitutes waiver of the right to review by the district judge and the right to appeal the Court's decision. See United States v. Lugo Guerrero, 524 F.3d 5, 14 (1st Cir. 2008); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 605 (1st Cir. 1980).

/s/ Patricia A. Sullivan
PATRICIA A. SULLIVAN
United States Magistrate Judge
July 23, 2015